FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

02 JUN 25 PM 2: 10

U.S. DISTRICT COURT
N.D. OF ALABAMA

JERRY LAMAR STOKES,             )
                                )
        Plaintiff,              )
                                )
v.                              )   CASE NO. ~~CV-99-TMP-2991-S~~
                                )   Cr-01-TMP-1039-J
U.S. STEEL, a Division of       )
USX CORPORATION,                )
                                )
        Defendant.              )

## MEMORANDUM OPINION

This action is before the court on a motion for summary judgment filed January 31, 2002, by defendant United States Steel Corporation ("U.S. Steel"). The motion is supported by depositions, documents, and a brief. The plaintiff, Jerry Lamar Stokes, filed a brief in response and evidence in support of his opposition. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c); accordingly, the court enters this memorandum opinion.

## I.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

18

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language

of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 586 (1986).   If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).   Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).   Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.   Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS

For purposes of the pending motion for summary judgment, the following facts are undisputed or, if disputed, have been construed in a light most favorable to the non-moving plaintiff.

The plaintiff is a 48-year-old white male who began working at U.S. Steel in August 1972, and since has been continually employed

-4-

there.  U.S. Steel operates the steel plant known as the "Fairfield Works," where plaintiff is employed as a furnaceman, working in what is called the "Q-bop" area of the plant, where liquid iron is processed into liquid steel.  Stokes is a member of the United Steelworkers of America and is a former officer of the union.

The plaintiff filed the complaint commencing the instant action on April 25, 2001, alleging that he has been the victim of retaliation by his employer after engaging in "protected conduct" pursuant to Title VII.  He bases his retaliation claim on 42 U.S.C. § 2000(e) *et seq.*, and 42 U.S.C. § 1981, alleging that he engaged in protected conduct on or about March 17, 2000, when he filed a charge of discrimination with the Equal Employment Opportunity Commission concerning the promotion of a black employee to a vicing foreman position.  Stokes complained to the EEOC that he had been denied the promotion on the basis of his race.[1]  He alleged to the EEOC that the promotion to the position of vicing foreman was given to Willy Doaty expressly because Doaty is black.  Stokes also

---

[1]    For reasons that are not clear to the court, the plaintiff has not pled a claim for discrimination in the promotion of Willie Doaty to vicing foreman.  Even though he alleges that he has direct evidence of discriminatory practices – that three supervisory employees at U.S. Steel told him they were promoting Doaty because he is black – plaintiff asserts no such claim and, in fact, his attorney at deposition reiterated that the only claims asserted are retaliation claims.  (Stokes Depo., p. 203).  Accordingly, the court examines only the claims plaintiff has pled.

complained to U.S. Steel managers that the promotion of Doaty was discriminatory.[2]

Stokes asserts that, after he voiced his complaints and filed the EEOC charge, he was subjected to unlawful retaliation by U.S. Steel.  Specifically, he claims that he was denied two subsequent promotions to vicing foreman awarded to other employees, was not allowed to temporarily "step up" into higher-paying positions, was suspended from work on two occasions without pay, and was subjected to harassment and ridicule in the workplace that amounted to an adverse employment action in the sense that the employer allowed the hostile work environment to continue.

Defendant seeks summary judgment on all of the plaintiff's claims.  U.S. Steel asserts that there is no causal connection between any of the complained-of conduct and Stokes' protected conduct, and that the "harassment" Stokes complains of amounts to no more than trivial workplace disagreements that do not rise to the level of actionable harassment.

---

[2]    U.S. Steel asserts that Doaty was not promoted to vicing foreman, but was being paid as a vicing foreman during the time he was in training for a shift manager job, referred to as a "melter." U.S. Steel asserts that it paid Doaty at the rate of a vicing foreman during his training in settlement of a grievance that was filed by the union regarding the company's use of vicing foremen. Whether Doaty was in fact promoted to vicing foreman is, however, irrelevant to the resolution of the questions at issue in the instant motion for summary judgment.

## A. Disciplinary History

Even before the promotion that prompted his complaint to the defendant and charge of discrimination to the EEOC, Stokes had a long history of disciplinary actions taken against him. He was given a one-day suspension for unsatisfactory work on October 5, 1996. On February 1, 1998, he was given a five-day suspension for failure to timely perform his duties and an additional three-day suspension for sleeping on the job. Five days later, he was given a written warning for absenteeism. On May 22, 1998, however, plaintiff signed a "Memorandum of Understanding," which stated that U.S. Steel withdrew the disciplinary actions dated February 1, 1998. Two years later, on February 9, 2000, he was given another written warning for absenteeism.

Almost eight months after Stokes filed the EEOC complaint about Doaty's promotion on March 17, 2000, he was given a written warning for unsatisfactory job performance on November 14, 2000. Also in November 2000, Stokes was suspended for a total of sixteen days for threatening co-workers Roy Reed, Sam Winn, and Tony Hill. A witness to the threat on Winn reported that Stokes told Winn: "I could cut your throat, and never think a thing about it."[3] Reed reported that Stokes had threatened to "kick [Reed's] ass." Stokes

---

[3]     Stokes points out that there is some discrepancy in Winn's account of the threat and the witness's account; however, both accounts include the allegation that Stokes referenced cutting Winn's throat.

reportedly told Jackie Posey that he would go to Tony Hill's farm "and shoot every horse with Tony, Tony's wife, and Tony's son watching." Plaintiff signed an agreement accepting the suspensions and agreeing to seek counseling. He also was warned that he would be subject to discharge for any further threatening incidents.

On January 31, 2001, U.S. Steel received another complaint that Stokes had threatened an employee. This time, the complaint was made by Heath Townsend, a co-worker and a relative of Stokes. As a result of the complaint, both Stokes and Townsend were suspended for five days. U.S. Steel agreed not to fire Stokes if he would sign a "Last Chance Agreement" in which he agreed not to threaten any other employee and was informed that he would be subject to discharge for any future threats. Stokes claims that he signed the agreement "under duress" in that he had to sign it in order to be allowed to return to work. He does not allege that he was physically coerced or forced to sign the agreement.

Stokes complains as well that the retaliation took the form of disparate disciplinary treatment. He contends that he overheard Roy Reed threaten a co-worker, Sam Walker, which Stokes reported to supervisor Pat Thomas, saying that Reed said to Walker: "If it were not so far down there, I'd come down there and whip your ass." Walker did not report receiving a threat. Thomas and another supervisor, Bruce Heaton, met with Walker and Reed separately to investigate the report, but neither reported making or receiving

-8-

such a threat, except to admit that they sometimes joked with each other. The defendant did not discipline Reed because it determined that no threat had been perceived by Walker. Plaintiff argues that this disparate disciplinary treatment evidences U.S. Steel's retaliation against him.

Stokes also complains that he was threatened with termination on one occasion when he left work at the end of his shift but before his replacement arrived. He claims that his supervisor, Ed Olvey, was previously made aware of plaintiff's need to leave to attend a medical appointment, but that when his shift ended and his replacement had not arrived, Olvey told him not to leave and threatened to fire him if he did. Stokes left, but was not terminated or otherwise disciplined for it.

## B. Relationships with Co-Workers and Managers

Over the past several years, Stokes developed a reputation in the workplace as a man who had altercations with other workers, managers, the union, and a neighbor. Stokes was in the habit of carrying a small spiral notebook with him to the plant in which he would write down incidents that he considered slights or insults. The other employees knew about his book and often made remarks to him like, "Have I made your book today?" In the spring of 1999, Stokes was in a fight with an older man who owned property adjoining Stokes' home, arising from a property line dispute

-9-

between them.  The man apparently hit Stokes with a pipe and injured him.  Stokes told some of his co-workers about the altercation.  Co-workers also were aware of an incident in which Stokes had a confrontation with an older janitor at the steel plant after Stokes complained to the janitor about the soap dispenser in the restroom or bathhouse.

Stokes resigned from his union office as Assistant Grievance Committeeman after he was accused of double-dipping -- being paid by both the company and the union for time spent on union activities.  He was subjected to a union trial for the charge of double-dipping and was found guilty and ordered to re-pay some of the money he received.[4]  He resigned after a petition was signed by numerous union members, urging that he be removed from office.

In November of 2000, U.S. Steel received complaints that Stokes had threatened Sam Winn, Roy Reed, and Tony Hill.  Three months later, Heath Townsend reported that Stokes had threatened to "whip" him.[5]  Stokes was disciplined for both of these incidents.

---

[4]     These incidents are relevant to the instant motion only to the extent that they demonstrate that Stokes had developed, at best, strained relationships with his co-workers.  It is clear from the record that Stokes was not liked by his co-workers. Accordingly, it is clear to the court that the subsequent name-calling and hostility in the workplace about which Stokes now complains did not arise from Stokes' protected activity.

[5]     Although Stokes denies having made any threats, it is undisputed that U.S. Steel received reports that such threats had been made.

He complains that he later reported to management that he had overheard Roy Reed tell another employee that he would "whip [the other employee's] ass" and that Reed was not disciplined.[6]   U.S. Steel asserts that it investigated Stokes' account of the "threat," and was unable to substantiate that it had occurred, or that the employee to whom it was addressed perceived the statement as anything more than a joke.

In October 2000, Tony Hill, a supervisor, stated that Stokes appeared on the job one day acting especially loud, combative, and angry.  Stokes had told Hill in the past that he had problems with blood sugar and hypertension, so the supervisor sent Stokes to the plant medical center for an evaluation.  The plant doctor noted that Stokes had a problem with controlling anger; she classified Stokes as unfit for work until he was more fully evaluated by a psychiatrist.  Stokes was not allowed to work until he visited the psychiatrist.  Although Stokes did not show up for his first appointment, he eventually did visit the psychiatrist, who released plaintiff to work.  Stokes reported to U.S. Steel that Hill harassed him by sending him to the doctor.  The company interviewed witnesses who had seen Stokes on the day he was sent to the medical department and concluded that Hill's actions were not harassment.

_____

[6]   The alleged threat by Reed occurred before Reed was promoted.

Stokes also complains that he was made fun of and called names at work.   More specifically, he alleges that a picture posted in the crew shack in September 2000 depicted a Sumo wrestler in a ballerina pose and was titled "Sumo Stokes."   He complained that his supervisors laughed about it and told him to go on a diet.   He does not know who posted it, and subsequent investigations by U.S. Steel failed to identify who did it.   Stokes further alleges that on one occasion he was told to clean up the crew shack and, in doing so, he threw away the toaster oven.   A note was placed on his locker, referring to the person who threw away the oven as a "mother-fucker."   Stokes was told by supervisors that the note was just a joke, although neither Stokes nor the supervisors know who posted the note.

In the fall of 2000, Stokes took time off for knee surgery. In the book in which time off is recorded, someone wrote that Stokes was out of work on that date "having a baby."   Stokes does not know who made the notation.   He asserts that he complained to management and was told that the note was a joke.

Stokes found another picture posted in the workplace, titled "Deer Killing," that showed a hunter having sex with an animal. The name "Stokes" was written next to the animal, and "Reed" was written next to the hunter.   Stokes showed the picture to the company doctor, and she noticed that the picture was drawn in pencil, but that the names were written in ink.   Stokes complained

-12-

about the picture.  U.S. Steel interviewed several employees about the picture and could not identify who posted it, but reminded all employees working in the area of the company's policy prohibiting harassment.  Stokes also complained that co-workers had spread rumors that he was having an affair with Shana Decker, a female employee.  Finally, Stokes claims that graffiti was written about him in the crew shack, including a reference to him as "lard ass."[7]

In February 2001, Stokes complained about several of the incidents to Chuck Bennick, the personnel manager at Fairfield Works.  Bennick has testified that he investigated the claims and was unable to conclude that plaintiff had been harassed.  Even so, the defendant sent letters to Stokes and to all of the employees involved in the alleged harassment, advising them of the company's policy prohibiting harassment.

### C.  Promotions to Vicing Foreman

Stokes asserts that he has been repeatedly denied promotions to the position of vicing foreman in retaliation for his March 2000 complaints of discrimination.  In 1993, U.S. Steel instituted a program by which employees interested in promotion to foreman jobs could nominate themselves.  If no vacancy existed at the time an employee self-nominated, his application would remain on file until

---

[7]     Stokes also complains of other perceived slights, such as not being invited to a hot dog cookout, that simply are too trivial to mention.

-13-

a vacancy occurred.   At that time, three members of management would interview self-nominated candidates to determine which met the minimum qualifications.  The manager of the work area in which the vacancy existed then selected the candidate he determined to be best qualified.

Stokes nominated himself for a vicing foreman position on March 3, 1993.  In 1995, a vacancy occurred and interviews were scheduled, but plaintiff failed to appear for his interview and was thus not considered for the vacancy.  Plaintiff again nominated himself on December 11, 1996.  In 2000, black employee Willie Doaty was given a vicing foreman position, and Stokes was told that the position was given to Doaty because he was black.  Supervisors also told Stokes that he did not receive the promotion because he had a "bad attitude" and because he was disliked by union members because of his conduct when he was a union officer.  It was this promotion of Doaty that prompted plaintiff to file his March 17, 2000, charge of discrimination with the EEOC and to complain to U.S. Steel management.

In early 2001, another vicing foreman position became open. Roy Reed was selected to fill the position and began training on April 1, 2001.  Ed Olvey made the decision to hire Reed, and he has stated that Reed was the best qualified candidate for the position, and that plaintiff was not selected because he was not able to manage other employees and could not get along with his co-workers

and managers.   In July of 2001, another vicing foreman position was filled.   Gary Salter was selected for the job by supervisor Bruce Heaton.   Heaton has stated that he believed Salter was the best qualified candidate and that he did not select Stokes because he believed Stokes "could not get along with people on the floor." However, Stokes has testified by affidavit that Heaton told him he had "screwed [him]self out of that position" by filing the EEOC charge against U.S. Steel.

Stokes also complains that he was not allowed to temporarily "step up" into higher-paying positions when that opportunity arose. Under the collective bargaining agreement ("CBA") between the union and U.S. Steel, vicing foremen positions were filled on a temporary basis (i.e. for less than three weeks) whenever a vacancy occurred due to illness or vacations by allowing the next most senior employee to "step up" to the position until the regular foreman returned.   The agreement, however, expressly provided that the employee "stepping up" had to be on the same "turn" (i.e., shift) and crew as that in which the vacancy occurred.   Stated another way, an employee, even a more senior employee, was not allowed by the CBA to "step up" to fill a vacancy on a "turn" or crew other than his own.   U.S. Steel denies that Stokes was prevented from "stepping up" for any other reason than compliance with the "step up" rules established by the CBA.

### III. DISCUSSION

As a preliminary clarification, it is important to understand what claims plaintiff has asserted and what he has *not* asserted. Plaintiff's two-count complaint alleges only retaliation claims pursuant to both Title VII and 42 U.S.C. § 1981.[8]   He has not alleged free-standing claims for discriminatory discipline, denial of promotions, or even hostile work environment.   What he alleges is that, after he filed his March 2000 charge of discrimination with the EEOC, he has been subjected to retaliation by U.S. Steel, taking the form of disparate disciplinary action, denial of promotion, and permitting his co-employees to engage in a complaint of harassment of him.   Counts One and Two of the complaint are identical in their allegations of retaliation, except that One is based on § 1981, while Two is grounded in Title VII.   The same facts underlie the two causes of action.

Section 1981 provides that "all citizens shall have the same right to 'make and enforce contracts.'" 42 U.S.C. § 1981(a); see also Brown v. American Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991), cert. denied, 502 U.S. 1058, 112 S. Ct. 935, 117 L. Ed. 2d 106 (1992).   The essential purpose of § 1981 is to prohibit discrimination by race in the making and enforcement of contracts,

---

[8]      Although the complaint clearly states that the action arises under both Title VII and § 1981, neither party addresses the § 1981 claim in the motion for summary judgment, the supporting brief, plaintiff's opposition, or the reply brief.

including employment contracts.  Section 1981 was amended in 1991 to reflect that the protection applies not only to the right "to make and enforce" contracts, but also to the "performance, modification, and termination of contracts." 42 U.S.C. § 1981(b). Furthermore, Section 1981 has been held to support a cause of action for retaliation.  See Andrews v. Lakeshore Rehab. Hosp., 140 F.3d 1405, 1412-13 (11th Cir. 1998); Webster v. Fulton County, Ga., 283 F.3d 1254 (11th Cir. 2002); Dixon v. Young, 2000 WL 33224515 (N.D. Ga. 2000).  The party who is denied a contract because of retaliation, in this case an employment contract in the form of a promotion, may bring a § 1981 retaliation claim.  See Webster v. Fulton County, 283 F.3d 1254, 1256 (11th Cir. 2002).

Title VII also supports a claim for retaliation.  See 42 U.S.C. § 2000e-3(a).  Although the Eleventh Circuit Court of Appeals has never stated that the elements of a § 1981 retaliation claim are identical to those of a Title VII retaliation claim, other circuits have established that the same analysis applies to both.  See, e.g., Barge v. Anheuser-Busch, Inc., 87 F.3d 256 (8th Cir. 1996).  Other district courts in this circuit also have recognized that the same analysis applies to both Title VII retaliation claims and retaliation claims brought pursuant to Section 1981.  See, e.g., Clark v. City of Macon, 860 F. Supp. 1545, 1552 (M.D. Ga. 1994).  Thus, because the analysis is

identical, the court's discussion below applies equally to Counts One and Two of the complaint.

In order to survive a properly supported motion for summary judgment, the plaintiff asserting a retaliation claim, whether expressly under Title VII or § 1981, must establish a *prima facie* case by showing: (1) that he engaged in protected conduct and (2) suffered an adverse employment action, that was (3) causally linked to the protected expression. Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998); Taylor v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999). In addition, the plaintiff must show that his employer was aware of his participation in the protected activity when it took the adverse action. Maniccia v. Brown, 171 F.3d 1364,1369 (11th Cir. 1999). The defendant asserts that plaintiff's claims are due to be dismissed because he has failed to establish a *prima facie* case of retaliation.

In this case, there is no dispute that Stokes' conduct in complaining about race discrimination in the promotion of Doaty to vicing foreman constituted protected conduct. This is true with regard to both his EEOC charge of discrimination and his complaints directly to management. There also is no dispute that U.S. Steel was aware of the conduct. The issue is whether the various events plaintiff complains of constituted "adverse employment action" and, if so, whether it is causally related to plaintiff's protected activities and, thus, properly attributable to the defendant.

-18-

There is no dispute that the plaintiff has shown that, after the filing of his EEOC charge, he was denied promotions and received suspensions without pay on at least two occasions. The court agrees that such actions may be considered "adverse employment actions" for purposes of a retaliation claim. The plaintiff in a retaliation case also must show that there is some causal relation between the act of opposing discrimination and the adverse employment action. Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Id. at 1460, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993). However, to meet even this low threshold of proof of causation, the plaintiff must offer some evidence from which a jury could infer that the filing of the EEOC charge or the act of complaining to management about Doaty's promotion caused the denial of promotion, the suspensions, or the harassment.

### A.   Discipline

The plaintiff has asserted that the discipline meted out by U.S. Steel after he complained of discrimination was motivated by a desire to retaliate. Specifically, Stokes points to his

suspensions for threatening co-workers.  The court finds that there exists no genuine issue of material fact relating to any retaliatory motives for the suspensions.

These facts suggest that there is no causal link between the protected activity in March 2000 and the disciplinary actions in November 2000 and January 2001.  Clearly, if U.S. Steel had wanted to retaliate against Stokes, it had the perfect opportunity to do so by terminating him upon either the first "dischargeable offense" of threatening Reed, Winn, and Harris, or the subsequent threat allegedly made to Townsend.  Yet, on both occasions, the employer seemed to go out of its way to preserve plaintiff's job, not terminate it.  If U.S. Steel wanted to retaliate, it would not have settled for a half-loaf measure like suspension; it would have seized the entire loaf of termination.  Moreover, although Stokes contends he did not make the threats he was accused of, it is undisputed that several co-workers reported the threats to management, they were investigated by management, and plaintiff accepted his suspensions without utilizing the union grievance procedure available to him.

There simply is no evidence that U.S. Steel fabricated the allegations or prompted the co-workers to make false allegations against plaintiff.  Once presented with the allegations of threats being made, U.S. Steel took reasonable steps to investigate them and discipline those involved.  There is no evidence that any of

the accusations were in any way related to the protected conduct; likewise, there is no evidence that U.S. Steel handled the discipline in any way that was tainted by or related to Stokes' complaints of discrimination.

Further, the time delay between the protected activities in March 2000 and the suspensions in November 2000 belies any causal link.  Such an attenuated temporal relationship generally belies the assertion of causation.  See, e.g., Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999), and cases cited therein.

Plaintiff attempts to show that defendant's disciplinary actions were unfair or in bad faith by contending that Roy Reed was treated less harshly when Stokes reported that he overheard Reed threaten another worker.  The evidence is undisputed, however, that defendant investigated Stokes' report, interviewed the two employees, Reed and Walker, both of whom denied that any threat had been made.  Unlike the allegations against plaintiff, there simply was no substantiating evidence that Reed threatened Walker.  Accordingly, this disparity creates no genuine issue of fact concerning whether plaintiff's suspensions represented retaliation by U.S. Steel.  Summary judgment cannot be avoided by arguments "based on hunches unsupported with significant probative evidence." Raney v. Vinson Guard Services Inc., 120 F.3d 1192, 1198 (11th Cir. 1997).

In sum, plaintiff has failed to provide significant probative evidence that the discipline he received in November 2000 and February 2001 was caused by a retaliatory animus.  There is no evidence that the suspensions were anything other than "wholly unrelated" to his earlier protected activities; therefore, he cannot establish a *prima facie* case in relation to the claims of retaliatory discipline.  Accordingly, the defendant's motion for summary judgment on claims relating to discipline is due to be granted.

### B.   Harassment

Stokes asserts that he was ridiculed, harassed, and humiliated by his co-workers and supervisors, and that U.S. Steel did nothing to prevent the harassing conduct in order to retaliate for plaintiff's protected activities.  The court finds this claim is due to be dismissed for two reasons.

First, most of the incidents described by plaintiff -- the notations in the log book, the pictures in the crew shack, and the grafitti -- were created by unidentified persons with unidentified motives.  There is no evidence that the notation in the "time off" log, the graffiti at the crew shack, the hunting picture, or the Sumo picture are attributable to U.S. Steel.  Stokes' only claim in relation to these incidents is that U.S. Steel failed to prevent the harassment or to remove the offending materials.  While Stokes

argues that managers laughed at the incidents, U.S. Steel has demonstrated that it made some investigation into Stokes' complaints, and it is undisputed that U.S. Steel was not able to identify any perpetrators it should have disciplined.  The employer took steps to investigate and to remind workers in the area that the company would not tolerate harassment.  In short, U.S. Steel did all it could do to combat these particular incidents. Accordingly, the claims relating to the anonymous writings and pictures do not support any claim for retaliatory harassment against U.S. Steel.

Stokes further complains that he was subjected to harassment in that he was told by co-workers to move his "watermelon-headed ass," was called "lard ass" and "mother-fucker."  He also complains that rumors circulated accusing him of having an affair with a female employee.  The vulgar comments are just that, but they have no apparent connection to Stokes' protected activity.  Furthermore, such rude comments, while distasteful, are not the sort of conduct that Title VII was enacted to prevent.  The comment that Stokes was "getting called in the office over damn lawyers" does appear to have some connection to his complaints of discrimination, but the comment, while perhaps embarrassing, does not constitute the kind of adverse employment action that gives rise to a claim of retaliation.  Even viewed in their totality, these incidents do not rise to the level of a hostile work environment of the sort the

company was obligated to correct.  There is no evidence that the company failed, due to any retaliatory motive, to take reasonable steps to eliminate hostile comments in the workplace.  Absent some evidence that the defendant intended to retaliate against plaintiff by failing to prevent harassment by co-workers, plaintiff has not established either an adverse employment action by U.S. Steel or a causal link between his protected activities and his difficulties with other employees.

### C.  Promotions

Plaintiff complains that he was denied both temporary "step ups" and promotions to vicing foreman in retaliation for his protected activities.  Although most of these claims also are unsupported by evidence, one of them survives summary judgment.

At the outset, plaintiff has failed to identify any particular occasions when he was denied a temporary "step up."  As a result, he has failed to dispute defendant's evidence that plaintiff was not eligible for any "step up" that occurred after March 17, 2000.  Plaintiff would have been eligible under the CBA only for temporary "step ups" on his own crew and turn, and he has simply failed to present any evidence that such an opportunity arose.  There is no evidence that a temporary vacancy occurred on his crew and turn which he was denied the opportunity to fill.

The first promotion that Stokes complains of occurred more than a year after he engaged in the protected activity.   On April 1, 2001, Reed was promoted to vicing foreman by Ed Olvey. Such an attenuated temporal relationship generally belies the assertion of causation.   See, e.g., Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999), and cases cited therein.   Moreover, plaintiff has not offered any evidence that Olvey's decision was the product of a retaliatory motive.   Olvey has testified that he chose Reed over plaintiff because he did not believe plaintiff could supervise the workers because of his problems with getting along with them.   Stokes has offered no evidence that this explanation is false or unworthy of belief.   Indeed, during the year that elapsed between the time that Stokes filed his EEOC charge and the time the vicing foreman position was filled, U.S. Steel received complaints that Stokes had threatened four co-workers.

The second promotional opportunity came in July 2001, when Bruce Heaton promoted Gary Salter to vicing foreman.   While there is a long time-gap between plaintiff's protected activities and the denial of this promotion, such that ordinarily one could not infer a causal link, Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999), in this case, the plaintiff has offered direct evidence that the failure to promote him was retaliatory.   He states in his affidavit that Heaton told him he had "screwed himself" out of any

vicing foreman job by filing the EEOC charge.  A reasonable juror could infer from this evidence that Heaton's decision not to promote plaintiff, a decision attributable to U.S. Steel, was in retaliation for his complaints of discrimination.  Accordingly, the plaintiff has presented a genuine issue of material fact relating to his claim that he was illegally denied the promotion given to Salter due to retaliation for having engaged in the protected activities of complaining about the allegedly discriminatory promotion of Doaty in March 2000.  Defendant's motion for summary judgment is due to be denied in this particular claim of retaliatory denial of promotion.

## IV.  CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented by defendant in support of the motion for summary judgment, and in light of the plaintiff's failure to meet his burden of coming forward with evidence sufficient to create a genuine issue of material fact as to the issues of harassment and discipline, this court determines that defendant's motion for summary judgment against plaintiff is due to be granted in part as to all of plaintiff's claims of retaliation except for the claim of retaliatory denial of the promotion to vicing foreman given to Gary Salter, as to which the motion will be DENIED.

-26-

A separate order will be entered in accordance with the findings set forth herein.

DATED this 25th day of June, 2002.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE